# Illinois Official Reports

## Appellate Court

---

### *People v. Gunn*, 2020 IL App (1st) 170542

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. OMAR GUNN, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>No. 1-17-0542 |
| Filed | June 30, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-21956(01); the Hon. Timothy Joseph Joyce, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Kathryn L. Oberer, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Clare Wesolik Connolly, and Miles J. Keleher, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Justices Lampkin and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1     Defendant Omar Gunn, 17 years old, was charged as an adult and convicted after a bench trial of first degree murder and sentenced to 40 years with the Illinois Department of Corrections (IDOC).

¶ 2     In his initial brief in this appeal, defendant claimed (1) that we should reverse his conviction and remand for a new trial because his trial counsel rendered ineffective assistance of counsel or (2) that, alternatively, we should remand for resentencing because the trial court failed to consider mandatory mitigating sentencing factors or (3) that we should reduce his sentence or remand for resentencing because a 40-year sentence imposed on a 17-year-old, like defendant, constitutes a *de facto* life sentence and violates the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11).

¶ 3     However, defendant's initial brief was filed before our supreme court decided *People v. Buffer*, 2019 IL 122327. Defendant's 40-year sentence now sits right on the dividing line recently drawn by the *Buffer* court, between what does and does not constitute a *de facto* life sentence. See *Buffer*, 2019 IL 122327, ¶ 40. The *Buffer* court found that, in determining when a juvenile's sentence is long enough to be considered *de facto* life, "we choose to draw a line at 40 years." *Buffer*, 2019 IL 122327, ¶ 40. Summing up its finding, the court stated: "We hereby conclude that a prison sentence of 40 years or less imposed on a juvenile offender does *not* constitute a *de facto* life sentence in violation of the eighth amendment." (Emphasis added.) *Buffer*, 2019 IL 122327, ¶ 41.

¶ 4     In response to *Buffer*, defendant filed a supplemental brief, arguing (1) that other language in the *Buffer* opinion supports a finding that 40 years is long enough to be considered a *de facto* life sentence; (2) that defendant's 40-year prison sentence, plus his 3-year mandatory release term, constitutes a 43-year total sentence and, thus, *is* a *de facto* life sentence under *Buffer*; and (3) that *Buffer* was decided solely under the eighth amendment of the United States Constitution and did not address our state's proportionate penalties clause and that defendant's sentence violates our state's proportionate penalties clause in light of recent changes in juvenile sentencing enacted by our state legislature.

¶ 5     For the following reasons we affirm.

¶ 6                                    BACKGROUND

¶ 7     The evidence at trial established that 18-year-old Jaleel Pearson (the victim) was shot in a corner store during the early evening of September 20, 2013, at the corner of 71st Street and Crandon Avenue in Chicago. The State presented three event witnesses: (1) a bystander who testified that defendant followed the victim into the store and that he then heard gunshots inside the store; (2) the store's cashier, who observed defendant shoot the victim in the store and overheard the victim's dying declaration identifying defendant as the shooter; and (3) the victim's girlfriend, who observed defendant outside the store after the murder with a gun handle in his waistband.

¶ 8     Since trial counsel's representation is at issue in this appeal, we set forth below his representation both before and during trial.

¶ 9                                    I. Pretrial Representation

¶ 10     On December 4, 2013, when defendant was arraigned on the indictment, he was represented by a private attorney. On March 24, 2014, he moved to withdraw, and defendant's family informed the court that they and counsel had "several disagreements about this case." The case was then continued to permit defendant time to obtain new counsel.

¶ 11     On April 17, 2014, a new attorney filed his appearance and represented defendant through May 16, 2016, when the trial court informed defendant that his current attorney had been suspended from the practice of law and, thus, could no longer represent defendant. The trial court informed defendant that his attorney's associate, who had represented defendant on several prior court appearances, was "currently undergoing some medical treatment" but that defendant could "continue with Mr. Wilk or go with somebody else." Either way, however, the trial court needed "to know what [defendant] want[ed] to do." The trial court offered defendant a continuance so that defendant could "talk it over with Mr. Wilk when his health [was] on the mend, [and] figure it out then." Defendant agreed, and the trial court continued the case for a month to permit that to happen.

¶ 12     At the next court date on June 14, 2016, Thomas Kougias, a new attorney on the case, entered his appearance. Defendant's mother explained that Kougias was "supposed to be representing him from [the suspended attorney's] office, because we already paid [the suspended attorney]. So he's supposed to be an associate of his." However, Kougias clarified:

          "Judge, I'm going to [need] leave to file my appearance today. I spoke with the family. Judge, I also need to spread of record so the family is not confused. They had represented to me that they had paid [the suspended attorney] in full. I know that's not the Court's concern, and it's really not my concern

          But I did explain to them what procedures they need to follow in order to try and obtain those funds back, whatever they paid. Whatever he's not earned, he needs to return.

          *** Here's the other concern. I don't know [the suspended attorney's] file that he had on this matter. I need to try to locate it. I know it's an old case. It's a 13. I know this case has whiskers. We need to get it moving. I don't have a problem with that."

Counsel then informed the court that he was going to work with the assistant state's attorney (ASA) to duplicate the file.

¶ 13     On July 13, 2016, counsel informed the court that the State had duplicated the file, that he had received a portion of the file from the suspended attorney's office, that he was asking for August 26, 2016, for a final status conference, and that a bench trial was "indicated."

¶ 14     On August 26, 2016, counsel informed the trial court:

          "The only issue I have—and I really don't understand why it's happening, but it still is—this young man is in the custody of Cook County yet and they are transferring him out to Kankakee, and I don't understand why. A couple dates ago he'd be housed in Kankakee and then be brought back here and the last time they just kept him out there. It is a gross inconvenience to try and go out there. I need to meet with him. And my point is I haven't met with him to go [over] everything ***."

The trial court then continued the case to September 23, 2016, stating that the court "will presume in the meantime you will be able to meet with" defendant.

- 3 -

¶ 15    On September 23, 2016, counsel informed the trial court that he had "not gone to see him yet in Kankakee" and that he was not ready. The trial court then set the matter for October 27, 2016, for a status conference and November 21, 2016, for a bench trial.

¶ 16    On November 21, 2016, counsel informed the trial court that he had received information about a new potential alibi witness who counsel was to interview that day, and the parties then went off the record. Back on the record, the trial court stated that the State could begin its case and that the State was aware that defendant might present an alibi defense. Before accepting a jury waiver from defendant, the trial court informed defendant that, if he was found guilty of the most serious charge, the minimum sentence was 45 years. The trial court recalled that it had presided over the bench trial of a codefendant but that it had "no specific or particular recall of the evidence" and that it "had no idea what decision" it might reach in defendant's case. The court then accepted defendant's jury waiver, and his bench trial began.

¶ 17                                    II. Trial
¶ 18                            A. Opening Statements
¶ 19    During the State's opening statement, the ASA conceded that the court "will not hear a reasonable explanation or a good explanation as to why the defendant did what he did that day." Instead, the ASA focused on the evidence identifying defendant as the shooter, namely, the victim's dying declaration and the expected testimony of the three event witnesses. In response, counsel acknowledged that the State's witnesses placed defendant "on the scene at different times" but argued that, after hearing "all the evidence," the trial court would find defendant not guilty.

¶ 20                            B. Event Witnesses
¶ 21    Tyera Cooks, age 19 years old, testified that she was a stay-at-home mother with two children. At the time of the victim's death, she and the victim had been dating for two years. On September 20, 2013, the day of the offense, Cooks was 16 years old and a junior in high school. At 6 p.m., she was inside a barber shop at the corner of 71st Street and Luella Avenue with three friends: Michelle Casey, "Shadonna," and "Quiel." Cooks had been with the victim at 5 p.m. on nearby Crandon Avenue, and she had plans to meet him again after she finished in the barber shop. The barber shop had large windows that looked out onto 71st Street, a major thoroughfare. Train tracks for the Metra commuter rail separated its east and westbound lanes of traffic at the street level.

¶ 22    Cooks testified that a friend of hers observed "there go 'Lil Ant and Bonna[1] crossing the street." Through the windows, Cooks observed "Bonna" and "Ant" waiting by the train tracks, as two trains were approaching, both heading east. On the northwest corner of 71st Street and Crandon Avenue was a corner store, which sold soda, chips, and lottery tickets. The corner

---

[1]"Bonna" is later identified as defendant. However, we continue to use the name "Bonna" in describing the event witnesses' testimony because that is the name that all the event witnesses used and the name that appears in the victim's dying declaration. To simply call him "defendant" in the following recitation of facts would obscure the significance of the name "Bonna," which ties all their testimonies together. Announcing the verdict, the court found: "It's not a coincidence that everybody identifies Bonna. It's proof beyond a reasonable doubt that [defendant] is guilty of the murder" of the victim.

store was across the street from the barber shop. When she first observed Bonna and Ant, the corner store was behind them.

¶ 23 Cooks testified that she observed Bonna and Ant unzipping their hooded sweatshirts, or "hoodies," and loosening the strings around their hoods. They were there only a few seconds before the gates descended that block traffic from oncoming trains. Eventually, Bonna and Ant crossed the tracks, toward the barber shop. As they headed in Cooks's direction, they removed their hoodies and placed them in a backpack that Bonna carried. After Bonna removed his hoodie, Cooks observed the "hand part of a gun" in the back of his waistband. The gun was a black, medium-sized gun. Cooks also observed a gun in Ant's waistband. Cooks did not recall the color of the hoodies that Bonna and Ant wore. Both Bonna and Ant wore T-shirts under their hoodies. Once Bonna and Ant crossed 71st Street, they walked down Luella Avenue toward 72nd Street.

¶ 24 Cooks testified that, in the past, Bonna and Ant hung around her house and that she had known both of them for four years prior to the offense. In court, she identified defendant as Bonna. At the time of the offense, she did not know Bonna's real name; she knew that "Lil Ant's" real name was Anthony, but she did not know his last name. When she observed them on the day of the offense, they were walking side by side and not running. While she was in the barber shop, she did not hear any gunshots. After Bonna and Ant walked around the corner, "Sam," who owned the corner store, came to the front of the barber shop and told her that the victim had been shot. Defense counsel objected to the question "did you learn anything from Sam," but the trial court overruled the objection, finding that Sam's statement that the victim had been shot was not admitted for the truth of the matter asserted but to explain what the witness did next.

¶ 25 Cooks testified that her friend, Michelle Casey, went to the corner store. Cooks did not go at first because she "was in shock." When she did go, the paramedics would not let anyone inside the store. The ambulance transported the victim to John H. Stroger Jr. Hospital, and Cooks followed. Cooks did not inform the police officers who were at the scene or at the hospital about the guns that she had observed. Cooks explained that she was very emotional and upset.

¶ 26 On October 17, 2013, detectives from the Chicago Police Department contacted her, and she viewed a lineup at a police station. At that time, she informed the police what she had observed, and she identified Bonna and Ant from the lineup.

¶ 27 Since defendant's first claim on appeal is that his counsel rendered ineffective assistance in his cross-examination of witnesses, we provide detail below about what he elicited on cross-examination.

¶ 28 Counsel established that Cooks had last been with the victim at 3 or 4 p.m., not 5 p.m. as she had testified on direct examination, and that she had entered the barber shop at 5 p.m. Cooks admitted that, from 5 to 6 p.m., she did not hear any gunshots or a vehicle backfiring or anything out of the ordinary. Cooks testified that her nickname was "T." When her friend pointed out that Bonna and Ant were standing by the train tracks, Cooks testified that she was "wondering what they doing on this side of town." When asked if there was anything unusual about them waiting to cross the train tracks, Cooks replied: "Yeah. They don't never be down there on Crandon." As a result, Cooks was thinking, "what they doing down here? What's their purpose to be down here?"

- 5 -

¶ 29    Cooks testified that she did not remember the color of their hoodies but that the hoodies were "most likely" black. Cooks testified that, as she watched them, she was looking over her shoulder. She was sitting in a chair, with her back to Bonna and Ant, and she had to turn her head over her shoulder in order to see them. Counsel established that, before Cooks turned her head, she was facing into the barber shop and could not observe what transpired behind her. The two men were not running, and they could have walked east or west without the train tracks blocking their path. Counsel established that the two men waited until the crossing gate went up before crossing the train tracks.

¶ 30    Cooks also testified that, when the crossing gate was down, which was only one or two minutes, the two men were unzipping and untying their hoodies. That is when the gate went up, as they were walking and taking off their hoodies at the same time. Cooks asserted that they were the only two people waiting at the crossing gate. When asked whether the gun handle she observed was for a revolver or a semiautomatic pistol, Cooks conceded "I don't know nothing about guns."

¶ 31    Cooks further admitted that she did not observe the gun handle as the two men waited at the crossing gate, since she could observe only defendant's front and the gun handle was in the rear of his waistband. When the two men crossed the street, they were walking diagonally toward the barber shop, which was "how the street was made." Cooks testified: "As he's walking towards me, you know, the street go[es] diagonal[ly], so his body is on a slant. So I can see half front and half back." Defendant pulled his T-shirt out of his pants to cover up the gun. Ant also had a gun in the rear of his waistband.

¶ 32    Further, Cooks admitted that, when she first observed the guns, she did not exclaim to her friends "looks like he's got a gun." When she walked over to the store after the victim had been shot, she spoke with the paramedics, asking them where the victim was being taken. On October 17, 2013, the police came to speak to Michelle Casey, Cooks's friend, who was on house arrest at the time. Cooks happened to be present, and that was when Cooks first informed the police what she had observed. Cooks testified that she was 5 feet, 6 inches, that defendant was shorter or 5 feet, 5 inches, and that Ant was taller or 5 feet, 9 inches. Cooks emphasized that she did not know anything about guns, stating "I don't own a gun. I don't play with guns," and that she never observed either Bonna or Ant touch their guns or draw them out.

¶ 33    Tyquyne Hatchett, age 21 years old, testified that he had been lifelong friends with the victim and that he had known "Bonna" and "Ant" from school for a couple of years before the offense. On September 20, 2013, at 6 p.m., Hatchett had run into the victim at the corner of 71st Street and Crandon Avenue, and they were chatting. When the victim entered the corner store there, Hatchett waited for him. While waiting, Hatchett crossed the street because he had observed "the loose square guy," who sells single cigarettes. While standing with the loose square guy, Hatchett observed two men in hoodies walking along Crandon Avenue toward 71st Street, on the opposite side of the street from Hatchett. The two men were wearing both hoodies and jackets, with the hoods on their heads.

¶ 34    Hatchett testified that, although across the street, the two men were walking toward him and, as they approached, he was able to observe their faces. When he observed their faces, Hatchett was "about 15 footsteps" away from them. Hatchett recognized them as "Bonna," who Hatchett identified in court as defendant, and "Lil Ant." As Bonna and Ant approached, the victim was in front of the store, with his head down, counting his money. When the victim looked up toward Bonna and Ant, the victim ran into the store. Bonna clutched his waist

- 6 -

through his hoodie's pockets and ran into the store behind the victim. Hatchett agreed with the ASA that "Bonna had both of his hands in his hoodie pockets."[2] Ant also clutched his waist, but he did not run all the way into the store. The store had an outside and an inside door and a small vestibule between the two doors. Bonna was at the second door, and Ant was behind Bonna.

¶ 35 Hatchett testified that, after observing Bonna and Ant chase the victim, Hatchett started running and, shortly after, he heard three gunshots coming from inside the store. Hatchett explained that he ran because he thought there was going to be a shooting. Hatchett ran across the train tracks on 71st Street into a building that also houses the barber shop. Hatchett ran to that building because he knew people who lived there. However, he stayed there only "for a minute" until he "heard the sirens and ambulance," and then he "came out to see what was going on." After observing an ambulance and police, Hatchett learned that the victim had been shot. However, Hatchett did not approach the police to tell them what he had observed because he was "talking to people, trying to see [if] *** they [were] all right."

¶ 36 Hatchett testified that, on October 3, 2013, he was at a police station on an unrelated matter, when he told police what he had observed. Hatchett waited until October 3, because he was scared and he "didn't really want to talk to the police." Hatchett spoke to police again on October 15, 2013, and he viewed a lineup on October 17, 2013, from which he identified Bonna and Ant as the two men who had chased the victim.

¶ 37 Again, we provide in detail the information elicited on cross-examination, as that is the subject of one of defendant's claims on appeal.

¶ 38 During cross-examination, Hatchett agreed that the day of the offense was "a sunny, nice day." Hatchett testified that Bonna and Ant were wearing two separate garments: a jacket, with a hoodie underneath. Bonna was wearing a blue jacket, while Ant's jacket "could have been black." Both of them were wearing black hoodies with the hoods up and tied. Hatchett agreed that was unusual because it was warm. Hatchett himself was not wearing a jacket or a hoodie.

¶ 39 Hatchett testified that he did not observe any bulges protruding from their bodies and that their hands were in their jacket pockets. Hatchett also admitted that, since he was across the street, his view of the two men was a "slight angle view." When the victim entered the store the first time, the two men were not on the street. Hatchett purchased cigarettes, and the victim was in the store for a minute or two. After the victim exited the store, Hatchett was looking at the victim as two men walked up. When the victim looked up at them, they clutched their waistbands, and the victim ran into the store, and they ran after him. The two men did not call out or say anything to the victim. Hatchett observed Bonna by the inner door and Ant by the outer door, but Hatchett never observed any weapons. Hatchett started running away and heard gunshots from inside the door. At that time, the first or outer door was open, and Hatchett could not observe Bonna. Although the victim had been a friend most of Hatchett's life, he did not say anything to the police at the scene.

¶ 40 Hatchett also testified that he went on his own on October 3, 2013, to speak with the police because he wanted justice for his friend. However, on redirect examination, Hatchett testified that he was at the police station on October 3 because he was a suspect in an unrelated case that he was never charged with.

---

[2]Later on cross-examination, Hatchett testified that they were wearing their jackets over their hoodies and their hands were in their jacket pockets not their hoodie pockets.

¶ 41       The trial resumed on November 29, 2016, with the testimony of Juliet Peyrefitte, who testified that she was a college graduate and a "manager in retail." In September 2013, she had been employed for six months as a cashier at the corner store at 71st Street and Crandon Avenue. The store, which was "fairly small," had a set of double doors with a small vestibule between them. In addition, there was a third door in the back by the cash register. Peyrefitte knew the victim because he came into the store every day; she knew him as "Little J." On September 20, 2013, she was working from 9 or 10 a.m. to 9 p.m., and she observed the victim on her way to work. Sometime around 5 or 6 p.m., she observed the victim again as he entered the store for chips or soda. After his purchase, he exited the store. About 30 or 35 minutes passed between when the victim exited the store after his purchase and when he came running back into the store.

¶ 42       Peyrefitte testified that, when the victim ran back into the store, she initially thought he was "going to rob the store" but, when she asked him "what's going on," he replied "they are trying to kill me." When Peyrefitte looked past the victim, she observed defendant about a foot or a foot and a half behind the victim. Peyrefitte then observed defendant "lifting up a gun and fir[ing] a shot." Peyrefitte observed the gun in defendant's hand, and she testified: "I can remember the spark from the gun, like flames and smoke. And the first shot went off. And I saw [the victim] went backwards ***." Peyrefitte testified: "Then I saw the bullet ricochet, well hit the back pegboard we had there. And then after that I yelled at [the victim], telling him that he's coming in. And [the victim] turned around to push the door, that's when the second shot went off." At that point, Peyrefitte ran "around the other side of the enclosure."

¶ 43       Utilizing photographs, Peyrefitte testified about the store's interior and identified a door marked "Exit" that led to the outside and an interior door that led to a back area for the cashier. Peyrefitte was in the center of the cashier area.

¶ 44       Peyrefitte testified that, after the second shot was fired, the victim "started yelling out at me. He started yelling out Bonner shot me. He said call the police, call the ambulance; I'm hit, I'm hit. Bonner shot me." The victim started walking over to her, but then he collapsed. Peyrefitte called the police and laid the victim out, trying to stop the bleeding.

¶ 45       Peyrefitte testified that, after the victim was shot, defendant "casually" walked out of the store. Explaining what she meant by casually, she testified: "[H]e didn't run out like there was a problem or something. He just walked out like he just bought something and walked out." After the victim collapsed on the floor, he "repeated the same thing again that Bonner shot me, Bonner shot me. And then he started saying mom, I love you. I'm sorry, mom. Mom, I love you."

¶ 46       Defense counsel objected to the victim's statements as hearsay. However, the State observed that the trial court had previously granted the State's motion to admit the victim's dying declarations. The trial court then noted that counsel had not been involved in the case at that time. Ruling on counsel's objection, the trial court found that "the circumstances just here establish a dying declaration and an excited utterance simultaneously," so the trial court overruled counsel's objection.

¶ 47       Peyrefitte testified that, when defendant ran into the store, he was wearing a white shirt, a blue hoodie, and jeans. Although the hoodie was tied "real tight on his face," Peyrefitte was able to observe his whole face. When the police arrived, Peyrefitte was still in the store, but she did not speak to the police because: "I was in shock. I didn't want to say anything. I was scared. I couldn't say anything." Peyrefitte did not return to work at the store, and on October

18, 2013, she went to the store to inform them that she would not be returning. While at the store on October 18, 2013, she encountered Detective O'Brien, who was outside. She told him she was ready to talk about what happened, and she went with him to the police station where she identified defendant as the shooter.

¶ 48 Peyrefitte informed the police that there was video surveillance in the store and that, as far as she knew, it was in working order the entire time that she worked there. Peyrefitte testified that she had previously viewed the video, marked as People's exhibit 23, and that the video truly and accurately depicted what happened on September 20, 2013. The video was then admitted into evidence without objection, and it was published to the court.

¶ 49 The video contains three clips. The first clip depicts the victim running into the store, chased by another person. However, it is impossible to discern the pursuer's face from the video. The video shows a flash of bright blue when the pursuer appears in the store. The second clip depicts Peyrefitte hiding under a counter and then emerging and making a call on her cell phone and the victim approaching her and then collapsing. The third clip shows Peyrefitte next to the victim after he collapsed. Although the tape does not include audio, Peyrefitte testified that, during the time period depicted in these clips, the victim was telling her that Bonna shot him and that he loved his mom.

¶ 50 On cross-examination, Peyrefitte testified as follows: Although she was inside a secured area during the offense, the door to the secured area was open and was "never locked." When asked if the area had bulletproof glass, she replied: "Supposedly." Sam, another cashier, was also in the store, but he was "doing like juices in the back." Initially, when the victim ran into the store, Peyrefitte thought he was trying to rob the place. However, when she did not observe anything in his hands, she asked him what was going on, and he responded "they are trying to kill me." After the victim ran into the store, he entered the secure area behind the bulletproof glass, and that is where he told her they were trying to kill him. The shooter was a foot behind him and two feet away from Peyrefitte.

¶ 51 Peyrefitte testified that the video depicted the shooter pointing a gun and firing. After two shots, Peyrefitte ran and hid under the counter. Almost immediately after the victim finished his statement that they were trying to kill him, she heard a gunshot. Peyrefitte noticed the shooter as he was running and had his gun drawn. She was focused on the shooter rather than the gun, but she did observe that he had a gun. Peyrefitte could not describe the gun; all she could recall was "the smoke from the gun" and that the gun was in the shooter's right hand.

¶ 52 Peyrefitte also admitted that she could not observe any of the shooter's hair and, thus, did not know whether he was bald or had a shaved head or braids. Peyrefitte admitted that she had never observed the shooter before in the store and that she had no idea if there was another person present as well.

¶ 53 When asked whether there was anything unique about the shooter's face, Peyrefitte testified as follows:

> "It's hard to explain to you. It's so traumatic to me that I have seen his face so many times. I mean, there's no saying—I don't know how to explain it. It couldn't possibly be somebody else because I have seen his face, it only haunts my dreams as well. I have been on medication because of seeing that person's face and what he did."

We provide the full quote above because defendant argues it on appeal as an example of counsel's ineffectiveness.

¶ 54 Counsel then clarified what he was trying to ask, and Peyrefitte admitted that she could not tell whether the shooter was wearing an earring or any jewelry and that she did not observe any scars on his face or his eye color or whether he had any braces or gold or silver teeth. The shooter was wearing a "Cubs blue" hoodie and a white shirt underneath, which was sticking out from his jeans. When asked if there were other people in the store, Peyrefitte testified that she was "oblivious to everybody else in the store." Although Peyrefitte called 911, she did not speak to the police when they arrived because the incident "could be gang related, retaliation" and she "lived in that neighborhood." She claimed that a coworker was there when the police arrived and that she (Peyrefitte) told the police "[n]othing."

¶ 55 When asked if she knew most of the customers, she replied that she "pretty much knew all the faces in the area." However, that was the first time that she observed the shooter.

¶ 56 Peyrefitte claimed, at first, that it was only "a couple days later" when she spoke to the police. However, under cross-examination, she admitted that it was a month. Peyrefitte then testified that, for a month, she kept her children home from school, that she did not speak to anyone, and that they "basically just stayed inside." Her children were 21, 17, and 7 years old, and she kept them out of school for a month. However, she then testified that she did leave to visit doctors, whom she told what happened.

¶ 57 Peyrefitte testified concerning the lineup on October 18 that the shooter's "face had made such an imprint in [her] life that as soon as [she] saw it again [she] was able to ID it." Peyrefitte agreed that the store video does not depict the shooter's face because his back was to the camera. On the day of the offense, after the police officers arrived, she left the store without telling them where she was going.

¶ 58 Finally, Peyrefitte testified that she was two feet away from the shooter, she had good vision, and the store was well lit, but she did not observe any scars on the shooter's face or bumps on his forehead. Peyrefitte agreed with counsel that "there's nothing unique or identifiable of this young man," except that "for the few moments that [she] had to look at this young man" she had "nightmares" about it. Peyrefitte admitted that she "wasn't looking at maybe pimples or bumps on his face," but rather she identified him based on "just the outline, just his features." She also admitted that there was never an angle on the video that revealed the shooter's face.

¶ 59                          C. Police Witnesses and Stipulations

¶ 60 Officer David Ryan testified that he was a forensic investigator in a mobile crime lab and that, on September 20, 2013, at 8:45 p.m., he arrived to process the crime scene in this case. He found one fired bullet lodged in a wooden pegboard inside the store but did not locate any firearms or fired cartridge cases. Ryan processed the scene for both blood samples and latent fingerprints, collecting blood samples from different locations inside and immediately outside the store and collecting four latent prints from the store's doors. On cross-examination, Ryan testified that none of the prints or blood "ultimately came back to" defendant. The prints and blood that Ryan recovered were sent to another crime lab for testing and analysis. However, to his knowledge, none of this evidence was linked to defendant.

¶ 61 Detective James O'Brien testified that, on September 20, 2013, after arriving at the crime scene, he directed an evidence technician to recover the video footage from the store's video camera. On October 5, 2013, he met with Tyquyne Hatchett, who stated that he observed Bonna and Ant chasing the victim into the store. Although Hatchett had attended grammar

school with Bonna, Ant, and the victim, Hatchett knew only Bonna and Ant's first names, which were Omar and Anthony, respectively. O'Brien then showed Hatchett photographs of defendant and Anthony Wells, which Hatchett confirmed were photographs of Bonna and Ant. O'Brien then issued an investigative alert for both defendant and Wells. Pursuant to this alert, defendant was arrested on October 16, 2013, and Wells was arrested on October 17, 2013.

¶ 62    O'Brien testified that, after speaking with the victim's family, O'Brien also learned that Tyera Cooks was a witness. After police located her, she agreed to come to the police station to view a lineup. On October 17, 2013, both Hatchett and Cooks viewed the same lineup but at separate times. Hatchett identified defendant as the person who Hatchett observed chasing the victim into the store with a gun and Wells as the person who was with defendant. Cooks identified defendant and Wells as the persons whom she observed crossing the street with guns in their waistbands.

¶ 63    O'Brien testified that, on October 18, he met with another witness, Juliet Peyrefitte, at the store and she returned with him to the police station to view another lineup, where she identified defendant as the shooter.

¶ 64    On cross-examination, O'Brien testified that he first met with Peyrefitte, the cashier, on September 20, 2013, immediately after the offense. However, he needed to review his report to refresh his recollection of the interview. After reviewing the report, he testified that she described the shooter only as "a male black in his teens" wearing "a blue hoodie." O'Brien agreed that Peyrefitte did not describe "any unique characteristics or markings, scars or tattoos." He did not recall her stating that the hoodie was tied tightly around the shooter's face. Peyrefitte stated specifically that the shooter "shoved the door open with his left hand." On the night of the shooting, Peyrefitte did not provide the name "Bonna" for the shooter; rather that name was first provided to the police in an anonymous 911 call.

¶ 65    O'Brien testified further that, on October 18, 2013, he went to the store looking for Peyrefitte. When O'Brien was asked why Peyrefitte had not come forward for a month, O'Brien responded that she was "scared to death" and "had a panic attack [w]hen we were talking to her." O'Brien also admitted that the first contact that he had with Hatchett, another witness, was not until October 15, 2013.

¶ 66    When counsel asked O'Brien if he recalled whether defendant had any marks, scars, or tattoos when O'Brien processed his arrest, O'Brien replied that he had not prepared the arrest report. When counsel directed his attention to a scar on the bridge of defendant's nose, O'Brien responded that he "could have gotten that scar since then." O'Brien could not "specifically recall" whether defendant "had it then." O'Brien also admitted that he could not discern from the video if defendant was the shooter.

¶ 67    In response to a question from the trial court, the State stipulated that, when Peyrefitte spoke to the police on the day of the offense, she did not inform them that the victim had told her that Bonna had shot him. The parties also stipulated that, if called to testify, (1) Eric Eason, an assistant medical examiner, would testify that the victim died of multiple gunshot wounds; (2) Diana Pratt, a ballistics examiner with the Illinois State Police, would testify that the bullet that Officer Ryan recovered from the wall of the store and the bullet that the medical examiner recovered from the victim's body were fired from the same firearm; and (3) Michael Cox, a fingerprint examiner with the Illinois State Police, would testify that he examined four latent prints lifted from the crime scene, that one was not suitable for comparison, that he received fingerprint cards for defendant, codefendant Anthony Wells, and cashier Juliet Peyrefitte, that

- 11 -

two of the three suitable prints were made by Peyrefitte, and that a comparison of the cards with the remaining print did not lead to an identification.

¶ 68                              D. Closing Arguments and Verdict

¶ 69        The State then rested, and the defense moved for a directed finding, which was denied. The defense then rested, and the parties proceeded to closing argument. During the State's closing argument, the State emphasized the testimony of the three event witnesses, as well as the victim's dying declaration identifying defendant as the shooter. During the defense's closing, counsel argued that Cooks and Hatchett had no credibility by emphasizing the sticking points in their testimony—that Cooks conveniently looked out the window at just the moment that defendant was crossing the street and glimpsed the butt of a gun in his waistband but said nothing to the police on the scene, although she was the victim's girlfriend, and that Hatchett observed two people chasing his friend and then immediately heard gunshots, but also provided no information to the police on the scene. Counsel noted that defendant and his friend were not running when Cooks observed them but were actually waiting for the train gates to lift, although they could have easily moved in another direction. As for Peyrefitte, the cashier, counsel argued that "she picked out the wrong guy," in light of the fact that she had never observed the shooter before that day, that the hoodie was drawn tightly around the shooter's face, that she could not identify a single distinguishing characteristic about him, and that she had only a few seconds to view him. In addition, the other two event witnesses testified about two offenders; however, Peyrefitte mentioned only one, creating an inconsistency between her testimony and their testimony. Counsel argued that, if Peyrefitte was in an "altered state where she's so scared" and "an emotional wreck" then her identification should not be believed. Counsel also observed that neither the lifted fingerprints nor the video identified defendant as the shooter.

¶ 70        Prior to announcing its verdict, the trial court observed that the attorneys, who had appeared before the judge on other matters, had conducted themselves "in an exemplary manner," that they all did "an excellent job," that they made clear that they were "well-versed in the factual and legal underpinnings" of the case, and that their representation was "consistent with the high degree of professionalism I have come to expect from all these attorneys."

¶ 71        The trial court reviewed the testimony of the three event witnesses and then stated that "the question then becomes is *** their failure to describe what it was they saw at the time that they had an opportunity to first speak to the police" enough to "raise[ ] a doubt concerning [defendant's] guilt for the charge of first degree murder."

¶ 72        The trial court observed that Cooks and Hatchett had known defendant for years, making the lineups not as crucial. However, Peyrefitte's selection of defendant at a lineup was significant.

¶ 73        With respect to the argument that the witnesses' initial failure to speak out created a reasonable doubt, the trial court found:

        "The problem with that argument, excellently put forth by [counsel], is that I believe their testimony. I believe their testimony without qualification. I believe that they were genuinely scared on September 20 when they observed the events that they did; that they were scared when they spoke to the police; that, frankly, they were scared when they came into this courtroom. But despite their fears, in particular Ms. Peyrefitte, *** she evinces no

hesitation back in October or today of identifying [defendant] as the person who shot and killed [the victim]."

¶ 74 The court also observed that, in October 2013, when Peyrefitte mentioned Bonna as the person identified by the victim as the shooter, Peyrefitte had no connection either to Cooks or Hatchett and had "no idea who" Bonna was. By mentioning Bonna to Detective O'Brien, "she is, in fact, confirming everything he knows about the identity" of the shooter, and "at the time she says that to him *** she had no opportunity to have been fed that." The court found that this was "additional evidence that confirms her testimony."

¶ 75 In sum, the court found: "It's not a coincidence that everybody identifies Bonna. It's proof beyond a reasonable doubt that [defendant] is guilty of the murder" of the victim.

¶ 76                                                    III. Sentencing

¶ 77 On February 7, 2017, the trial court denied defendant's posttrial motion for a new trial and proceeded to sentencing. At the sentencing hearing, the State called three police witnesses to testify to previous instances of criminal misconduct by defendant. First, Officer John Fazy testified that, on August 17, 2010, he responded to a complaint of robbery. The complainant was Andre Kirkwood, who identified defendant in a show-up identification as one of the robbers. Kirkwood informed the officer that "he had been beaten, he was hit by bicycles, and had his property taken from his person by a group" of five offenders that included defendant.

¶ 78 Second, Officer Paul Carridre testified that on May 8, 2012, at 2:15 p.m., he responded to a report of shots fired. When he arrived at the location, he observed a group of approximately five males that included defendant. Defendant separated from the group, walked down a gangway between two houses, and then returned and continued walking with the group. Officer Carridre investigated the area that defendant had walked to and recovered a loaded .380 handgun, which was hidden in a black sock under some hosta plants between the houses. The gun contained eight live rounds. When the officer confronted defendant with this discovery, defendant admitted that he had placed the gun there and stated: "I stole it from my brother. I have it because the MCs have been shooting at us." Officer Carridre explained that the abbreviation "MCs" stood for "Mickey Cobras street gang."

¶ 79 Third, Officer Robert Douglas testified that, on July 20, 2011, at 3:30 p.m., he interviewed Deon Usher, who stated that defendant "and a few other guys" were "threatening him and his family because they were testifying against one of his friends." The interview occurred at Usher's residence, and Usher identified defendant, who was walking down the block in a group of approximately five individuals. After the three officers testified, members of the victim's family read their victim impact statements to the court.

¶ 80 The State then observed that the firearm enhancement for personally discharging a firearm was discretionary and that, without it, the sentencing range was 20 to 60 years. Discussing factors in aggravation, the State noted that in 2012, the year before this offense, defendant had been adjudicated delinquent for unlawful use of a weapon and placed on 18 months of juvenile probation. Officer Carridre had just testified about the facts underlying the adjudication. It was while on probation for possessing a loaded firearm that defendant shot and killed the victim in the present offense. The State remarked that, while the trial court must be thinking of recent case law concerning juvenile sentences, this defendant, although 17 years old, was not convicted under a theory of accountability but rather was the one who "personally took" the

victim's life. The prosecutor then stated that the State was "not taking a position with respect to any particular sentence."

¶ 81    In mitigation, counsel argued that defendant had strong family support, that he was on the honor roll while in school, and that he worked various jobs including as a window washer, in construction, and in the school kitchen. Counsel asked for imposition of the minimum sentence. Defendant then addressed the court to say that he was "truly innocent" but sorry for the victim's family.

¶ 82    The trial court then stated that it was "familiar with the factors in aggravation and mitigation in the Unified Code of Corrections under Sections 5-5-3.1 and 3.2." The court observed that, if it applied the firearm enhancement of 25 years to natural life, then the minimum sentence would be 45 years, and the maximum would be 85 years or natural life. The court noted that this enhancement was now discretionary due to recent legislative changes in response to cases finding "that a mandatory minimum sentence of natural life or what can be called *de facto* life *** is contrary to the constitution of the United States and the [S]tate of Illinois."

¶ 83    The trial court stated that this case was "confounding," where defendant had

"excellent family support, loving mother and a father, was in school in the twelfth grade on the honor roll at the time of the offense, no seeming drug abuse, had a monthly income, notwithstanding that I'm sure he was supported by his employed parents, did not irresponsibly father any children during his teens, resided in the same home for a long time."

¶ 84    However, the trial court found that,

"despite all of these advantages, [defendant] went out and committed an offense that can only be described as horribly brazen. *** [H]e armed himself not only with a confederate, but also with a gun, put on hoodies on what was probably a nice day *** [and] [a]bsolutely assuredly sought out this particular person to shoot and kill."

Relating the details of the offense, the trial court repeatedly stated how "brazen" it was. For example, the court found that "[t]he brazen nature of this crime is further shown by how" defendant and codefendant "calmly" walked back across the street. The trial court found that these circumstances "militate in favor of a substantial sentence appreciably above the minimum of 20 years."

¶ 85    After discussing the offense, the trial court observed: "At the same time, there are other circumstances—he's a 17-year-old young man at the time of this offense. Some people would call him a boy." But he was "also an experienced criminal by that time."

¶ 86    In consideration of all the factors in aggravation and mitigation, the trial court exercised its discretion not to impose the firearm enhancement and sentenced defendant to 40 years with IDOC, plus 3 years of mandatory supervised release. Counsel then filed a motion to reconsider sentence, which the trial court denied. A timely notice of appeal was filed on February 7, 2017, and this appeal followed.

¶ 87                                                    ANALYSIS

¶ 88    Defendant claims, first, that his trial counsel's ineffectiveness entitles him to a new trial and, second, that the 40-year sentence he received as a minor is unconstitutional.

- 14 -

¶ 89                         I. Trial Counsel's Alleged Ineffectiveness
¶ 90                                   A. Standard of Review
¶ 91        Both the United States and Illinois Constitutions guarantee criminal defendants the right to the effective assistance of counsel. *People v. Hale*, 2013 IL 113140, ¶ 15. In general, the standard of review for determining whether an individual's sixth amendment right to effective assistance has been violated is *de novo*. *Hale*, 2013 IL 113140, ¶ 15. A *de novo* review means that a reviewing court performs the same analysis that a trial court would perform. *People v. Stephens*, 2017 IL App (1st) 151631, ¶ 48.

¶ 92                                   B. *Strickland* Test
¶ 93        In determining whether a defendant was denied effective assistance of counsel, we apply the familiar two-prong test established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and adopted by the Illinois Supreme Court in *People v. Albanese*, 104 Ill. 2d 504 (1984). *People v. Cherry*, 2016 IL 118728, ¶ 24. To prevail on a claim of ineffective assistance, a defendant must show both (1) that counsel's performance was deficient and (2) that this deficient performance prejudiced defendant. *People v. Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 687).

¶ 94        To establish the first prong, a defendant must show "that counsel's performance was objectively unreasonable under prevailing professional norms." *Domagala*, 2013 IL 113688, ¶ 36. In order to establish deficient performance, the defendant must overcome the strong presumption that the challenged action may have been the product of sound trial strategy. *People v. Manning*, 241 Ill. 2d 319, 327 (2011). Matters of trial strategy are generally immune from claims of ineffective assistance of counsel. *Manning*, 241 Ill. 2d at 327.

¶ 95        To determine whether counsel's performance was deficient, a reviewing court considers the entire record. *People v. Burnett*, 2019 IL App (1st) 163018, ¶ 9. Our "determination must be made on the basis of the entire record, not isolated instances." *People v. Hommerson*, 399 Ill. App. 3d 405, 415 (2010); see also *People v. Flores*, 128 Ill. 2d 66, 107 (1989) ("counsel's performance must be evaluated [based on] the entire record, and not upon isolated instances of alleged incompetence called into question by the defendant"). In addition, "effective assistance of counsel refers to competent, not perfect, representation." *People v. Palmer*, 162 Ill. 2d 465, 476 (1994); *People v. Stewart*, 104 Ill. 2d 463, 491-92 (1984). Since a defendant is "entitled to reasonable, not perfect, representation," "mistakes in strategy or in judgment do not, of themselves, render the representation incompetent." *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). A defendant must overcome "the strong presumption that counsel's performance fell within a wide range of reasonable professional assistance." *Palmer*, 162 Ill. 2d at 476.

¶ 96        To establish the second prong, that deficient performance prejudiced the defendant, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 694). "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome— or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *People v. Evans*, 209 Ill. 2d 194, 220 (2004); *People v. Colon*, 225 Ill. 2d 125, 135 (2007). When the evidence at trial is "overwhelming," a reviewing court will not be "persuaded that it is reasonably probable that a jury would have acquitted [the] defendant even in the absence" of counsel's alleged errors. *People v. Patterson*, 2014 IL

115102, ¶ 87. If the evidence of defendant's guilt is overwhelming, "[t]he reasonably probable impact of counsel's alleged error is not sufficient to undermine our confidence in the outcome of the trial" and, thus, not sufficient to establish the prejudice prong of the *Strickland* test. *Patterson*, 2014 IL 115102, ¶ 87.

¶ 97 Since a defendant must satisfy both prongs of the *Strickland* test, the failure to establish either prong bars the claim. *Cherry*, 2016 IL 118728, ¶ 24; *People v. Flores*, 153 Ill. 2d 264, 283 (1992).

¶ 98 C. Reasonable Performance

¶ 99 Our review of the entire record establishes that counsel's assistance was far from deficient. Although we review counsel's assistance *de novo*, we observe that the trial court made the same finding when it spontaneously observed at the end of trial that all the attorneys did "an excellent job," that they were "well-versed in the factual and legal underpinnings" of the case, and that their representation was "consistent with the high degree of professionalism" that the trial court had "come to expect from all these attorneys."

¶ 100 Our review begins with the pretrial proceedings, where the record shows that counsel obtained a duplicated file from the State and a portion of the file from prior counsel, that he did not want to proceed with trial until he had an opportunity to meet personally with defendant and review all the reports in this case, and that he was actively investigating a potential alibi witness.

¶ 101 During trial, counsel extensively cross-examined all of the State's witnesses. During the cross of Tyera Cooks, the victim's girlfriend, counsel established, first, that the times that Cooks had testified to on direct examination were not accurate, thereby impugning her overall memory. On direct examination, Cooks testified that she had been with the victim at 5 p.m., whereas on cross-examination she testified that she had been with the victim at 3 or 4 p.m.

¶ 102 On cross-examination, Cooks admitted that she did not hear any gunshots or anything out of the ordinary between 5 and 6 p.m. Cooks testified that defendant's hoodie was "most likely" black, when the video established that the shooter wore blue. Cooks admitted that she was sitting in a chair with her back to the window and, thus, had to twist her head around and look over her shoulder to observe defendant and Ant. Thus, counsel established that her vantage point was literally twisted and askew. Counsel established through his cross-examination of Cooks that the two men were not running, as one would expect immediately after a murder, but were actually standing and waiting for the crossing gate to rise and, then they walked, not ran. Cooks admitted that the two men could have walked east or west without waiting for the gate to rise or the trains to go by. Thus, if they were actually murderers trying to make their escape immediately after a crime, there were other directions in which they could have gone.

¶ 103 Defense counsel was also able to obtain repeated assertions from Cooks that she knew nothing about guns. Cooks admitted that she could not observe the gun handle as the two men stood waiting at the crossing gate because the gun was in the back of his waistband. Cooks conceded that she was able to glimpse the gun handle only on a diagonal view, as the two men were walking on a diagonal line toward her and only in the seconds before defendant allegedly pulled his T-shirt out of his pants to cover the gun. Thus, counsel established that Cooks had a brief, diagonal view as she peered, half-twisted, over her shoulder. Cooks admitted that, with respect to defendant, she could observe only "half" of his "front" and "half" of his "back."

¶ 104    Cooks further admitted that, when she first observed the guns, she did not exclaim to her friends about the guns. Thus, counsel established that Cooks made no immediate outcry. In addition, although the police were on the scene and Cooks spoke to paramedics, she never revealed what she had observed. Coincidentally, she happened to be present on October 17, 2013, when police visited the house of her friend, and that was when she first informed police about what she had observed. Counsel established that Cooks never tried to contact the police to provide any information about her diagonal, over-the-shoulder, gun-handle observations.

¶ 105    Counsel's cross-examination of Cooks also suggested a motive for her to lie, namely, her resentment that defendant and codefendant were in her neighborhood, which is a place she clearly thought they had no right to be. Cooks testified repeatedly that she "wonder[ed] what they doing [*sic*] on [her] side of town."

¶ 106    During the cross-examination of Hatchett, counsel emphasized that Hatchett's testimony contradicted Cooks's testimony about what Bonna and Ant were wearing. Hatchett testified that the two men were wearing *both* jackets and hoodies, with the jackets over their hoodies and their hands in their *jacket* pockets. By contrast, Cooks had testified that the two men were wearing *just* hoodies, which they were able to quickly remove while walking. Cooks's testimony made no mention of jackets, and if Bonna and Ant were wearing both hoodies and jackets, as Hatchett testified on cross, they would not have been able to disrobe as quickly as Cooks had alleged.

¶ 107    Counsel elicited from Hatchett that both Bonna and Ant were wearing black hoodies. In contrast, Peyrefitte testified that, when defendant ran into the store, he was wearing a white shirt, a blue hoodie, and jeans. Thus, Hatchett's testimony contradicted Peyrefitte's concerning the color of defendant's hoodie.

¶ 108    Counsel's cross-examination established that not one eyewitness agreed with the other about exactly what defendant was wearing. Hatchett testified that Bonna and Ant were wearing *both* jackets and hoodies when they ran into the store, but both Peyrefitte and Cooks's testimony contradicted this claim. Hackett testified that defendant's hoodie was black, and Cooks similarly testified that it was "most likely black," but Peyrefitte testified it was "Cubs blue," which is the bright blue of a local baseball team.

¶ 109    One could argue that the blue *jacket* recalled by Hatchett was the blue *hoodie* recalled by Peyrefitte, except for the fact that Peyrefitte testified that the hood of the hoodie, or the essence of a hoodie—*i.e.*, what makes it a hoodie—was tied tightly around defendant's face, and it was blue, while Hackett testified that the same part of the hoodie, namely, the hood, that he observed emerging from the jacket was black. A black hood cannot be reconciled with a bright, Cubs-blue hood. Thus, counsel did an effective job of drawing out these facts on Hatchett's cross-examination.

¶ 110    Counsel was also able to establish that Hatchett's view of the two men, like Cooks's view, was at an angle and across the street. Unlike Cooks, Hatchett never observed any weapons or even bulges protruding from their bodies. Although the victim had been a friend of Hatchett's for most of Hatchett's life, Hatchett admitted that he chose not to say anything to the police on the scene. Also, Hatchett claimed that he went to the police on his own on October 3, 2013, to speak with the police because he wanted justice for his friend. However, counsel's cross-examination forced the State to clarify on redirect examination that Hatchett was at the police station on October 3 because he was a suspect in an unrelated case and that he was never charged in that case.

¶ 111 During Peyrefitte's testimony, counsel objected to the State's use of the victim's statements of identification. However, through no fault of counsel, the trial court overruled his objection and admitted the statements as both dying declarations and excited utterances.

¶ 112 During cross-examination, Peyrefitte admitted that she could not observe any of the shooter's hair because the hoodie was drawn tightly around his face and, thus, she did not know whether the shooter was bald or had a shaved head or braids. Peyrefitte admitted that she had never observed the shooter before in the store and that she had no idea if there was another person present as well. Her inability to recall another person was in stark contrast to the testimony of the two other eyewitnesses who testified about a pair of men, acting as a pair.

¶ 113 Peyrefitte admitted that she could not tell whether the shooter was wearing an earring or any jewelry and that she did not observe any scars on his face or his eye color or whether he had any braces or gold or silver teeth and that she identified him based on "just the outline." The fact that Peyrefitte did not observe any scars is significant because later in the trial, during cross-examination, O'Brien acknowledged the presence of a scar on the bridge of defendant's nose.

¶ 114 Counsel established during the cross-examination of Officer Ryan, the forensics investigator, that none of the prints or blood that he collected from the crime scene "ultimately came back to" defendant.

¶ 115 On cross-examination, O'Brien admitted that, on September 20, 2013, when he met with Peyrefitte, the cashier, immediately after the offense, she described the shooter only as "a male black in his teens" wearing "a blue hoodie"—a description that could match hundreds of people, if not more. O'Brien admitted that Peyrefitte did not provide "any unique characteristics or markings, scars or tattoos," and he did not recall her stating that the hoodie was tied tightly around the shooter's face, as she had testified to at trial. In addition, Peyrefitte informed him that the shooter "shoved the door open with his left hand," which was significant because none of the recovered prints belonged to defendant. In addition, O'Brien confirmed that Peyrefitte did not provide the name "Bonna" on the night of the shooting, although she testified at trial that this was the name used by the victim to identify the shooter. As a result of this cross-examination, the trial court asked a question, and in response, the State was willing to stipulate that, when Peyrefitte spoke to the police on the day of the offense, she did not inform them that the victim had told her that Bonna had shot him. O'Brien also acknowledged the presence of a scar on the bridge of defendant's nose, which Peyrefitte had not mentioned, and acknowledged that one could not discern from the video if defendant was the shooter.

¶ 116 For all the above reasons, we cannot find that counsel rendered deficient performance. However, on appeal, defendant claims that counsel bolstered the event witnesses' identifications, when he elicited information on cross-examination such as that Peyrefitte was focused on the shooter and that his face made such an emotional impact on her life that it haunted her dreams, that Hatchett observed defendant wearing a blue jacket, and that Cooks's view of defendant crossing the street was not obstructed. First, counsel argued during closing that Peyrefitte's emotional trauma should make her less credible, not more. Second, as we explained above, Hatchett's testimony that defendant wore a blue jacket and a black hoodie contradicted the testimony of the other two event witnesses. Third, although her view was unobstructed, counsel established on cross-examination that Cooks had a brief, diagonal view as she peered, half-twisted, over her shoulder.

¶ 117    Defendant also argues that counsel's cross-examination permitted Peyrefitte and Hatchett to repeat how scared they were to come forward, thereby excusing their delay in providing information to the police, which was, for Hatchett, from September 20, 2013, to October 3, 2013, and for Peyrefitte, from September 20, 2013, to October 18, 2013. Defendant argues on appeal that the two-week delay by Hatchett and the three-week delay by Peyrefitte could have otherwise been used to undermine their credibility. However, during closing, counsel employed a different strategy, arguing that their testimony did not ring true—that they would be "so scared" on the day of the offense and suddenly not scared just a short while later. Counsel argued: "You're scared? Then what changed? Everybody seems to have been so scared that they couldn't talk to the police on the date in question, and they decide to open their mouths for whatever reason a month later? What changed?" As we noted above, matters of trial strategy are generally immune from claims of ineffective assistance of counsel. *Manning*, 241 Ill. 2d at 327.

¶ 118    Defendant also argues that counsel elicited information during the cross-examination of Detective O'Brien about a 911 call that would otherwise have been inadmissible hearsay. Counsel asked O'Brien whether the name "Bonna" was a name that Peyrefitte provided on the day of the offense "or did this come out subsequently?" O'Brien replied that the information about "Bonna came out over the police radio that night" and that the source was a person who had called 911 anonymously. Defense argues that counsel acted ineffectively when he elicited this testimony and then failed to move to strike it. First, whether to move to strike is a matter of trial strategy, and such matters are generally immune from ineffectiveness claims. *Manning*, 241 Ill. 2d at 327. Motions to strike may call more attention to objectionable testimony, which a trier of fact cannot unhear. Second, if there was one identifying witness and this hearsay statement was the sole corroboration, the result could be different. See, *e.g.*, *People v. Wright*, 65 Ill. App. 2d 23, 34 (1965) ("Nor can the error in admitting the [officers' hearsay] testimony be regarded as harmless in view of the fact that defendant was identified by but one witness."). However, in the case at bar, two separate event witnesses provided corroborating support for Peyrefitte's identification of defendant as the shooter. Lastly, this was a bench trial, and the trial court gave detailed reasons for its verdict, and this hearsay was not among them. Thus, we cannot find that counsel's alleged failure to move to strike this hearsay evidence rose to the level of constitutionally defective assistance.

¶ 119    For all the foregoing reasons, we are not persuaded that counsel provided constitutionally deficient assistance. Since defendant cannot satisfy the first prong of the *Strickland* test, the failure to establish this prong bars his claim. See *Cherry*, 2016 IL 118728, ¶ 24; *Flores*, 153 Ill. 2d at 283.

¶ 120                                    II. Constitutional Sentencing Issue

¶ 121    Next, defendant argues that we should remand for resentencing or reduce his sentence because his 40-year prison sentence, which was imposed for a crime committed when he was 17 years old, violates the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of our state constitution (Ill. Const. 1970, art. I, § 11).

A. Constitutional Provisions and *Buffer*

¶ 123      "The Eighth Amendment's prohibition of cruel and unusual punishment 'guarantees individuals the right not to be subjected to excessive sanctions.' " *Miller v. Alabama*, 567 U.S. 460, 469 (2012) (quoting *Roper v. Simmons*, 543 U.S. 551, 560 (2005)). "That right," the United States Supreme Court has "explained, 'flows from the basic "precept of justice that punishment for crime should be graduated and proportioned" ' to both the offender and the offense." *Miller*, 567 U.S. at 469 (quoting *Roper*, 543 U.S. at 560, quoting *Weems v. United States*, 217 U.S. 349, 367 (1910)). "The concept of proportionality is central to the Eighth Amendment." *Graham v. Florida*, 560 U.S. 48, 59 (2010). "And we view that concept less through a historical prism than according to ' "the evolving standards of decency that mark the progress of a maturing society." ' " *Miller*, 567 U.S. at 469-70 (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976), quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion)).

¶ 124      Like the eighth amendment, the proportionate penalties clause of the Illinois Constitution embodies our evolving standard of decency. *People v. Miller*, 202 Ill. 2d 328, 339 (2002) ("as our society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community" underlying both the proportionality clause and the eighth amendment). Specifically, the proportionate penalties clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. The purpose of the proportionate penalties clause is to add a limitation on penalties beyond those provided by the eighth amendment and to add the objective of restoring the offender to useful citizenship. *People v. Clemons*, 2012 IL 107821, ¶ 39; *People v. Fernandez*, 2014 IL App (1st) 120508, ¶ 63 ("the Illinois Constitution places greater restrictions on criminal sentencing than the eighth amendment's prohibition").

¶ 125      Recently, in *Buffer*, our supreme court found that, to prevail on a claim that a juvenile's life sentence[3] violated the eighth amendment, a defendant must show *both* (1) that he was "subject to a life sentence, mandatory or discretionary, natural or *de facto*," *and* (2) that "the sentencing court failed to consider youth and its attendant characteristics." *Buffer*, 2019 IL 122327, ¶ 27. As a result, a sentencing court's failure to consider youth and its attendant characteristics, by itself, is not enough. Our supreme court established a two-prong test. *Buffer*, 2019 IL 122327, ¶ 27. A defendant must show, first, that he was subject to a life sentence, before we even reach consideration of whether the sentencing court failed to consider his youth and its attendant circumstances. *Buffer*, 2019 IL 122327, ¶ 27.

¶ 126      Proceeding to the first requirement, we observe that defendant was not subject either to a mandatory life sentence or a natural life sentence. Thus, he can satisfy this requirement only if he can show that he was subject to a discretionary *de facto* life sentence.

¶ 127      With respect to what constitutes a *de facto* life sentence for a juvenile offender, our highest court found: "We hereby conclude that a prison sentence of 40 years or less imposed on a juvenile offender does *not* constitute a *de facto* life sentence in violation of the eighth amendment." (Emphasis added.) *Buffer*, 2019 IL 122327, ¶ 41. As we already noted, defendant's prison sentence is exactly 40 years. Thus, applying the words of the court's finding

---

[3]As a preliminary matter, a defendant must also show that he was "sentenced for an offense committed while a juvenile." *Buffer*, 2019 IL 122327, ¶ 27. In the case at bar, defendant satisfied this preliminary requirement.

to the facts of our case requires us to find that defendant's prison sentence, which is "40 years or less," is *not* a *de facto* life sentence.

¶ 128                                    B. Other Language

¶ 129          In response to *Buffer*, defendant argues, first, that other language in the *Buffer* opinion supports a finding that 40 years is long enough to be a *de facto* life sentence. Defendant argues that, based on this other language, we should interpret *Buffer* to find that his sentence constitutes *de facto* life.

¶ 130          According to defendant, this other language includes the following sentence from *Buffer*: "In determining when a juvenile defendant's prison term is long enough to be considered *de facto* life without parole, we choose to draw a line at 40 years." *Buffer*, 2019 IL 122327, ¶ 40. However, in the very next paragraph, the *Buffer* court clarified exactly where it was drawing this line, namely, that "40 years or less" was *not de facto* life. *Buffer*, 2019 IL 122327, ¶ 41.

¶ 131          Defendant also observes that Justice Burke, specially concurring, wrote: "The majority goes even further astray when it relies on section 5-4.5-105 of the Unified Code of Corrections (730 ILCS 5/5-4.5-105 (West 2016)) to reach the conclusion that a prison term of 40 years 'is long enough to be considered *de facto* life without parole.' " *Buffer*, 2019 IL 122327, ¶ 60 (Burke, J., specially concurring) (quoting *Buffer*, 2019 IL 122327, ¶ 40 (majority opinion)). Justice Burke explained that the legislature had recently provided, prospectively, a new sentencing scheme for defendants who were under 18 at the time their offenses were committed. *Buffer*, 2019 IL 122327, ¶ 60. The new scheme "requires a sentencing court to impose on a juvenile *a minimum* sentence of 40 years' imprisonment for certain egregious first degree murder offenses that would warrant a sentence of natural life imprisonment for an adult offender." (Emphasis in original.) *Buffer*, 2019 IL 122327, ¶ 60 (citing 730 ILCS 5/5-4.5-105(a), (b), (c) (West 2016)). Defendant argues that this shows that 40 years' imprisonment for a juvenile is equal to natural life imprisonment for an adult. However, Justice Burke specifically rejected this logic and found instead that this showed that the legislature thought that "*at least*" 40 years was necessary as punishment for certain murders, even if the offenders were minors. (Emphasis in original.) *Buffer*, 2019 IL 122327, ¶ 61. Thus, neither the quote from Justice Burke's opinion nor the legislative scheme support defendant's argument.[4]

¶ 132          Defendant also argues that this court has previously interpreted *Buffer* and "concluded that a prison term of 40 years is long enough to be considered a *de facto* life sentence." *People v. House*, 2019 IL App (1st) 110580-B, ¶ 53. However, the defendant in *House* received two consecutive natural-life sentences, so the facts of *House* did not require us to make any finding as to what constituted a *de facto* life sentence. *House*, 2019 IL App (1st) 110580-B, ¶ 4. As a result, defendant's reliance on *House* for this argument is misplaced.

¶ 133          In addition, the *Buffer* court was aware that some defendants would fall close to the line that it was drawing, but it believed that a categorical, bright-line rule was nonetheless desirable. The court observed: " '[C]lear, predictable, and uniform constitutional standards are especially

---

[4]Also the *Buffer* majority noted that "[t]he legislature evidently believed that this *40-year floor* for juvenile offenders who commit egregious crimes *complies* with the requirements" of eighth amendment jurisprudence, and the majority agreed with the legislature. (Emphases added.) *Buffer*, 2019 IL 122327, ¶¶ 39, 41 (majority opinion).

desirable' in applying the eighth amendment." *Buffer*, 2019 IL 122327, ¶ 29 (majority opinion) (quoting *Roper*, 543 U.S. at 594 (O'Connor, J., dissenting)). The *Buffer* court stated that it understood that drawing a line was subject to the objections always raised against categorical rules, but nonetheless it decided " 'a line must be drawn.' " *Buffer*, 2019 IL 122327, ¶ 29 (quoting *Roper*, 543 U.S. at 574 (majority opinion)). As a result, we cannot interpret *Buffer* as defendant suggests.

¶ 134                                    C. Mandatory Release Term

¶ 135    Next, defendant argues that his 40-year sentence, plus his 3-year mandatory supervised release term, constitutes a 43-year total sentence and, thus, *is* a *de facto* life sentence under *Buffer*.

¶ 136    In support, defendant argues that, although the Post-Conviction Hearing Act (Act) applies only to persons "imprisoned in the penitentiary" (725 ILCS 5/122-1(a) (West 2018)), our supreme court has determined that a person serving a mandatory supervised release term is considered imprisoned in the penitentiary for purposes of the Act. *E.g.*, *People v. Correa*, 108 Ill. 2d 541, 546-47 (1985).

¶ 137    First, the court's finding in *Correa* was specific to the Act. The court explained that it was finding that a mandatory supervised release term was included because courts "must construe [the Act] liberally to accomplish the purposes for which it was enacted." *Correa*, 108 Ill. 2d at 546.

¶ 138    Second, in *Buffer*, the defendant was sentenced to 50 years, "followed by 3 years of mandatory supervised release." *Buffer*, 2019 IL 122327, ¶ 5. However, throughout the opinion, the supreme court referred to defendant's 50-year sentence. See, *e.g.*, *Buffer*, 2019 IL 122327, ¶ 14. If the court believed that the three years of mandatory supervised release should have been counted, it would have referred to his 53-year sentence.

¶ 139    Third, *Buffer* said nothing about including a mandatory supervised release term and did state unequivocally that "a *prison* sentence of 40 years or less" is not life. (Emphasis added.) *Buffer*, 2019 IL 122327, ¶ 41. Thus, we cannot find that a mandatory supervised release term enters into our calculation of a "prison sentence" for purposes of the eighth amendment. See *Buffer*, 2019 IL 122327, ¶ 41.

¶ 140    Defendant further argues that, if he spends any of his supervised release term behind bars, then his prison time will be more than 40 years. Although we understand the force of defendant's logic, *Buffer* referred to a "prison sentence," rather than to prison time. See *Buffer*, 2019 IL 122327, ¶ 41. Also, defendant is arguing a hypothetical that is not present in the record before us. Thus, we are not persuaded by this argument.

¶ 141                                 D. Proportionate Penalties Clause

¶ 142    Lastly, defendant argues that *Buffer* was decided solely under the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and did not address our state's proportionate penalties clause (Ill. Const. 1970, art. I, § 11), and that defendant's sentence violates our state's proportionate penalties clause in light of recent changes in juvenile sentencing enacted by our state legislature. Defendant is correct that *Buffer* was decided solely under the eighth amendment. *E.g.*, *Buffer*, 2019 IL 122327, ¶¶ 13-27.

¶ 143    A sentence violates the proportionate penalties clause if "the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *Miller*, 202 Ill. 2d at 338.

¶ 144    Defendant argues that his 40-year prison sentence shocks the moral sense of the community because, first, it did not account for his rehabilitative potential, particularly the facts in the presentence investigative report indicating that he suffered from a learning disorder, received special education, regularly saw a grammar school counselor, and had to be hospitalized due to his anger. Defendant also argues that the trial court failed to connect his family support, school attendance, and employment history to his rehabilitative potential. Defendant acknowledges that his counsel failed to preserve these issues but argues that we should review them under the second prong of the plain error doctrine.

¶ 145    "[T]o preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). In the case at bar, defendant failed to do both. Thus, "we may review this claim of error only if defendant has established plain error." *Hillier*, 237 Ill. 2d at 545. "To obtain relief under this rule, a defendant must first show that a clear or obvious error occurred." *Hillier*, 237 Ill. 2d at 545. "In the sentencing context, a defendant must then show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Hillier*, 237 Ill. 2d at 545. Defendant argues the latter, or second-prong error.

¶ 146    We cannot find that the trial court's decision not to mention certain facts contained in the presentence investigation report, or its decision not to connect the facts in the way defendant hoped it would, rises to the level of plain error.

¶ 147    Second, defendant argues that his 40-year sentence shocks the moral sense of the community in light of recent changes in juvenile sentencing enacted by our state legislature. However, in the case at bar, the trial court stated at defendant's sentencing that it was aware of recent changes in both the case law and statutory law concerning juvenile sentencing. Exercising the discretion given to him by these new laws, the trial judge chose not to impose the firearm enhancement, thereby reducing defendant's maximum possible sentence from natural life to 60 years.

¶ 148    Lastly, we cannot find that a 40-year sentence for a 17-year-old who committed a premeditated, gangland-style execution shocks the moral sense of the community. The evidence established that defendant and codefendant were wearing hoodies on a warm day and that Hatchett instantly realized that there was going to be a shooting. They approached the victim—not the other way around. Not only did they approach him, they chased him. In the store, defendant gunned down an unarmed victim, who was trying to get away from defendant, thereby posing no immediate threat to defendant. After the execution, both Peyrefitte and Cooks testified about how calm and nonchalant defendant appeared. Defendant did not have the appearance of a nervous, jumpy juvenile but rather the calm of a cold-blooded killer. For all these reasons, we cannot find that a 40-year sentence for this 17-year-old defendant shocks the moral sense of the community.

¶ 149                              III. Statutory Sentencing Issue

¶ 150    Defendant also argues that the trial court committed plain error when it allegedly failed to apply section 5-4.5-105 of the Unified Code of Corrections (Code) at defendant's sentencing

- 23 -

hearing. 730 ILCS 5/5-4.5-105 (West 2016). Defendant concedes that his counsel failed to raise this issue in the court below and, thereby, forfeited the issue for our review. However, he asks us to consider it either as second-prong plain error or as ineffective assistance of counsel. As we already explained above, to show plain error in the sentencing context under the second prong, a defendant must show that "the error was so egregious as to deny the defendant a fair sentencing hearing." *Hillier*, 237 Ill. 2d at 545. However, the first step in any plain-error analysis is to determine whether a clear or obvious error occurred. *People v. Sebby*, 2017 IL 119445, ¶ 49. For the reasons explained below, we cannot find any error on the part of trial court or counsel. See *supra* ¶¶ 93-97 (setting forth the *Strickland* test for ineffective assistance of counsel).

¶ 151    Defendant's claim requires us to interpret section 5-4.5-105 of the Code. When we construe the meaning of a statute, "the primary objective of this court is to ascertain and give effect to the intention of the legislature, and all other rules of statutory construction are subordinated to this cardinal principle." *Metzger v. DaRosa*, 209 Ill. 2d 30, 34 (2004). "The plain language of the statute is the best indicator of the legislature's intent." *Metzger*, 209 Ill. 2d at 34-35. "When the statute's language is clear, it will be given effect without resort to other aids of statutory construction." *Metzger*, 209 Ill. 2d at 35. We review questions of statutory interpretation *de novo*. *Metzger*, 209 Ill. 2d at 34. *De novo* consideration means that we perform the same analysis that a trial judge would perform. *Ramirez v. Chicago Board of Election Commissioners*, 2020 IL App (1st) 200240, ¶ 11.

¶ 152    Section 5-4.5-105(a) requires a trial court to consider an additional list of mitigating factors at a juvenile's sentencing hearing. 730 ILCS 5/5-4.5-105 (West 2016). However, our supreme court has found that "the trial court's obligation set forth in subsection (a)" to consider these additional factors is temporally limited by "language in that same subsection." *People v. Hunter*, 2017 IL 121306, ¶ 48; *People ex rel. Madigan v. J.T. Einoder, Inc.*, 2015 IL 117193, ¶ 34 (in assessing the temporal reach of a statutory amendment, the first step is "to determine whether the text of the amended provision, itself, clearly expresses the legislature's intent").

¶ 153    Section 5-4.5-105(a) provides that, "[o]n or after the effective date of this amendatory Act of the 99th General Assembly, when a person commits an offense and the person is under 18 years of age at the time of the commission of the offense, the court, at the sentencing hearing," shall consider certain additional mitigating factors. 730 ILCS 5/5-4.5-105(a) (West 2016). Isolating just the temporal limit, the section states: "[o]n or after the effective date *** when a person commits an offense." 730 ILCS 5/5-4.5-105(a) (West 2016). The effective date occurs first; and then "[o]n or after" it, "when a person commits an offense," the court "shall" or will consider the listed factors. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 220 (2008) (when the statutory language is phrased in a particular tense, that must be given full effect). Thus, the plain language of the section shows that it applies only to offenses committed on or after the effective date, which was January 1, 2016. *Hunter*, 2017 IL 121306, ¶ 46. The offense in this case occurred on September 20, 2013. Since this offense was not committed on or after the effective date, this section did not apply at defendant's sentencing.

¶ 154    Defendant argues that this section applies to him because his sentencing occurred on February 17, 2017, after the effective date of January 1, 2016. As we noted above, the temporal limit is phrased in terms of "when a person commits an offense," not when a person is sentenced. Not only is this the plain language of the act, it was also a reasonable choice by the

- 24 -

legislature. *People v. Richardson*, 2015 IL 118255, ¶ 11 ("it was reasonable for the legislature to distinguish between offenses committed before and offenses committed after the amendment's effective date"). It was reasonable for the legislature to choose to subject offenders who committed the same offenses on the same day to the same set of considerations, regardless of when their sentencing date happened to be. The legislature chose not to have every juvenile offender resentenced according to these considerations, and rewarding those with a later sentencing date could have possibly rewarded offenders who had escaped justice longer. *Cf. Richardson*, 2015 IL 118255, ¶ 11 (it was reasonable for the legislature to avoid remands for additional sentencing hearings). Thus, the legislature spoke plainly and reasonably. See *People v. Buffer*, 2019 IL 122327, ¶ 29 (drawing a line will always be subject to objections by those falling on the wrong side of it).

¶ 155                                      CONCLUSION
¶ 156        For all the foregoing reasons, we find that defendant's trial counsel provided effective assistance and that defendant's 40-year sentence did not violate the eighth amendment, the proportionate penalties clause, or statutory law.

¶ 157        Affirmed.